Leola SANDERS, Plaintiff in Error,

v.

ST. JOHN'S HOSPITAL AND SCHOOL OF NURSING, INC., an Oklahoma Corporation, Defendant in Error.

No. 39438.

Supreme Court of Oklahoma.

Jan. 30, 1962.

Rehearing Denied Feb. 27, 1962.

Paul W. Brightmire, Tulsa, for plaintiff in error.

T. Austin Gavin, and Hudson, Hudson, Wheaton & Myle, Tulsa, for defendant in error.

BLACKBIRD, Vice Chief Justice.

This appeal involves an action instituted by plaintiff in error, hereinafter referred to as plaintiff, against the defendant in error, hereinafter referred to as defendant, for damages on account of personal injuries she received when she dropped to the bare concrete floor of a room assigned to her as a patient in a Tulsa hospital, hereinafter referred to merely as "St. John's", operated by said defendant.

Immediately previous to said accident, which occurred at 10:00 P.M., on November 16, 1957, plaintiff was lying on one of the two hospital beds in one of the hospital's double rooms. Though plaintiff testified as a witness for herself, she disclaimed any memory of the mishap, no one

except an unidentified patient in the other bed was present in the room with her, and it was never established whether she accidentally rolled off the bed (which was three feet high) or fell in attempting to get out of the bed, or fell to the floor after getting out of the bed. The last that appears to be known concerning the patient's situation before the accident was an observation expressed by a nurse's aid, named Mrs. Booher, who, after catheterizing the other patient in the room, left it about 9:45 o'clock that night. She testified that plaintiff then " * * * appeared to me to be quiet."

Plaintiff, in her early forties and married more than thirty years, had been brought to St. John's from a hospital at Pryor, Oklahoma, in July, 1957. She had had twenty operations of various kinds during the previous thirteen or fourteen years. In the Pryor hospital, she was apparently convalescing from the second of two operations she had had for abdominal adhesions, when she discovered that the incision— made to relieve a small bowel obstruction— had broken open. After her admission to St. John's, Dr. T, a Tulsa surgeon engaged for her, diagnosed her trouble as a multiple loop external fistula. Through the openings from her small intestine into her abdominal wall, the contents of the intestine had been coming, and, as a result, she had lost fluid and chemicals necessary for proper nutrition, causing her body to grow weak and dehydrated. The secretion had not only irritated, but partly digested and erroded, an area of her skin, and the tissues under it.

Before undertaking an operation to close the two holes of plaintiff's abdominal wall, Dr. T prescribed a course of intravenous nutrition, and blood transfusions, to build up her depleted physical condition so that she would be able to withstand the operation, and reduce the risk of death from it.

When, by November 1, 1957, plaintiff had responded sufficiently to the treatment that Dr. T was willing to undertake such an operation, he performed it, closing both of the aforesaid abdominal openings. After plaintiff had been in St. John's approximately two weeks thereafter, during which period drugs were often administered for plaintiff's pain and restlessness, Dr. T had her removed to the home of a son and daughter-in-law, Albert, Jr., and Jo Ann Sanders, on November 14, 1957. While there, plaintiff's vomiting and abdominal cramping, that had started in the hospital, continued or re-occurred, and she appears to have lapsed into a semi-comitose condition, perhaps better described by her neurologist's expression "state of disturbed consciousness." According to her testimony, plaintiff was still suffering pain and had no complete, or coherent, knowledge, or memory, of the period she spent in said home. It was shown, however, that on one occasion there she got out of bed, her legs collapsed under her, and she fell, or involuntarily sat, down on the floor. The second or third day plaintiff was at her son's home, she suffered acute small bowel obstruction, accompanied by nausea and vomiting, intense pain, and distension of the abdomen. She was then re-admitted to St. John's as an "emergency" case, on November 16, 1957, at about 7:30 P.M. Upon re-examining plaintiff, who had been brought to said hospital in an ambulance accompanied by her husband, Albert, and son, Bennie, Dr. T directed that, in addition to giving plaintiff drugs to ease her pain, Wagenstein suction be instituted by working a tube through her nose to her stomach to remove its contents and tend to relieve the pressure and swelling above the intestinal block, or obstruction. He also prescribed intravenous addatives to be siphoned from a bottle suspended near her bed (commonly referred to in the record as "IV") and a pyelogram, or flat X-ray of her abdomen, made by a portable X-ray machine brought into her room.

After plaintiff's aforenamed husband and son had been in her room a short time, Mrs. Shrier, who was defendant's nurse in charge of plaintiff (plus either 23, 25 or 27 other patients, with only 2 nurse's aids to

assist her) asked the husband to watch plaintiff " * * * while she was getting her IV * * * ". After Albert Sanders had complied with this request, plaintiff had had a hypo, and Mrs. Shrier thought plaintiff was "quieter", Mrs. Shrier suggested, or requested, that he and Bennie go home. Before leaving, however, Mr. Sanders advised Mrs. Shrier that plaintiff would need side rails put on her bed, and Mrs. Shrier, after obtaining Dr. T's consent, promised that such rails would be installed, and directed Mrs. Booher to get them. Mrs. Booher got the bed rails and placed them in the hall outside plaintiff's room, where they remained at 10:00 P.M., when the attention of Mrs. Shrier, a Mrs. Helt (a "medications" nurse) and the two nurse's aids was suddenly attracted to plaintiff's room by the noise of the IV bottle crashing and breaking on the room floor. When they went to plaintiff's room and discovered her face down on the floor; and the four had lifted her back into bed; the unused bed rails were brought into her room from the hall and installed on her bed.

At the trial, hospital records, examination reports, and the testimony of Dr. T, other members of St. John's staff and/or employees, as well as plaintiff and some of her named relatives (by blood and/or marriage) was introduced to show the above and other facts. The evidence also showed, among other things, that plaintiff suffered such injuries from the fall as to warrant assessment of her damages in at least a nominal sum.

Much of the evidence was apparently calculated to make the question of defendant's negligence, or lack of it, depend on whether or not, in view of plaintiff's medical history, and of the findings and observations that had been made concerning her at St. John's, defendant should have foreseen, or anticipated, the need of placing bed rails on plaintiff's bed, or having someone in constant attendance at her bedside to see that she stayed in the bed. The evidence on behalf of the defendant tended to show that bed rails could not be placed on plaintiff's bed while she was being X-rayed, but Mrs. Booher's testimony revealed that the X-raying had been completed when she left plaintiff's room, as aforesaid, at 9:45 P.M. This witness testified that neither Mrs. Shrier, nor anyone else, had told her to install the rails on plaintiff's bed, or to do anything with them, except bring them to the hall outside the room.

At the close of the evidence, defendant demurred to it, but before the court had ruled on said demurrer, plaintiff's counsel moved to dismiss the case without prejudice. The trial judge sustained this motion and discharged the jury on April 13, 1960. Five days later, defendant filed not only a notice of appeal, but also a motion to vacate the aforesaid order of dismissal. After taking under advisement, the latter motion, and a motion by plaintiff that a mistrial be declared, the trial court, on June 1, 1960, entered an order and/or judgment sustaining defendant's motion to vacate, denying plaintiff's motion for a mistrial, sustaining defendant's previous demurrer to the evidence, and dismissing the action "without leave to reopen * * * ". Plaintiff thereafter filed a motion for new trial, and, after this was overruled, perfected the present appeal.

Under the first of three propositions, plaintiff urges for reversal, she, in substance, argues that the trial court erred in sustaining defendant's demurrer, because, on the basis of the evidence, defendant's liability for plaintiff's injury was a determination that could properly be resolved only by a jury. Under one rule, for which plaintiff cites the first syllabus of Flower Hospital v. Hart, 178 Okl. 447, 62 P.2d 1248, and other cases, it is said that the degree of care and attention a hospital is obliged to exercise on behalf of its patients, is in proportion to their respective ailments and conditions. Plaintiff contends that this case is like Morningside Hospital and Training School for Nurses v. Pennington, 189 Okl. 170, 114 P.2d 943, in presenting the jury question of whether de-

fendant was negligent in not taking measures to prevent the accident which injured plaintiff. In an additional argument, plaintiff maintains that defendant " * * * assumed an absolute duty to protect plaintiff, when, after being warned by plaintiff's husband that his wife would fall out of bed if bed rails weren't put up, Mrs. Shrier responded by telling him to go on home and don't worry about it, we will take care of that * * *".

Defendant's entire answer to plaintiff's argument consists in attempting to demonstrate, solely on the basis of what the hospital records show, and its employees and staff members, including her physician, Dr. T, personally observed and determined concerning plaintiff's condition, that it was not negligent in failing to foresee, and take measures to prevent, the accident that injured plaintiff. This argument ignores, or fails to take into consideration, the warning given defendant, via Nurse Shrier, by plaintiff's husband, and said nurse's undertaking, on behalf of defendant, to see that bed rails were placed on plaintiff's bed. Herein lies a factual element that distinguishes this case from cases cited by defendant. In this connection, see the discussion in Pivar v. Manhattan General, 279 App.Div. 522, 110 N.Y.S.2d 786, 788, citing Ranelli v. Society of the New York Hosp., Sup., 49 N.Y.S.2d 898, 902–903. On the basis of the evidence here, we cannot, nor do we think the trial court could, properly, or correctly, say all reasonable men would agree that it was not negligence on the part of defendant, after it promised and had undertaken to put the bed rails on plaintiff's bed, to then fail, or neglect, to instruct, or direct, the nurse's aid, Mrs. Booher, or some other agent or employee, to do so, or to take reasonable measures to prevent plaintiff's body from leaving the bed and falling on the floor. Assuming, without deciding, that defendant, or its involved agents or employees, had no previous direct, or personal, knowledge of any fact, or finding, which would reasonably lead them to believe that such a thing might

occur—after they had warning of such a probability by plaintiff's husband, and had acceded to his request that bed rails be used, then defendant hospital was obligated to exercise reasonable care and diligence in carrying out, or executing, its said undertaking.

For the above reasons, it is our opinion that the trial court erred in sustaining defendant's demurrer to the evidence. On account of said error (if no other) the court should have sustained plaintiff's motion for a new trial. This determination renders it unnecessary to mention, or consider, other alleged errors.

In accord with the foregoing, the order and/or judgment overruling plaintiff's motion for a new trial is hereby reversed, and this cause is remanded to the trial court with instructions to sustain said motion.

WILLIAMS, C. J., and DAVISON, HALLEY, JOHNSON, JACKSON and IRWIN, JJ., concur.